IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

97 JUN -5 AM II: 30

U.S. [illegible] OF COURT
N.D. OF ALABAMA

CAROL C. MOORE, et al.,      )
                             )
        Plaintiff,           )
                             )
vs.                          )      CIVIL ACTION NUMBER
                             )
NORFOLK SOUTHERN CORPORATION, )     93-C-0133-S
                             )
        Defendant.           )

ENTERED

JUN 5 - 1997

## MEMORANDUM OF OPINION ON PLAINTIFF'S DISCHARGE CLAIM

Plaintiff Carol Moore claims, <u>inter alia</u>, that she was discharged by the defendant Norfolk Southern Corporation ("Norfolk Southern") in retaliation for the charges of discrimination she filed against it with the Equal Employment Opportunity Commission ("EEOC") and because she filed this nationwide class action. Based on the applicable law and clear and convincing facts, plaintiff has carried her burden of proof.

In light of the opinion which follows, by separate order, Norfolk Southern will be ordered to reinstate plaintiff to the position and status which she would have occupied in the absence of retaliation. Norfolk Southern will also be enjoined from retaliating against plaintiff in the future.

121

I.   The Applicable Law

Under Title VII of the 1964 Civil Rights Act, 42 U.S.C.A. §2000e et seq., it is unlawful for an employer to retaliate against an employee because she has opposed perceived "unlawful employment practices."   42  U.S.C.A.  §2000e-3(a).   Unlawful  employment practices include, among other things, racially-motivated denials of promotions.

To  establish  a  prima  facie  case  of  retaliation,  a plaintiff must prove (1) that she engaged in activities protected by Title VII, (2) that she suffered an adverse employment action, and (3) that there is some casual relation between the two events. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Weaver v. Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991). The filing of a charge of racial discrimination with the EEOC and the filing of a lawsuit alleging racial discrimination are activities protected by Title VII.  See 42 U.S.C. §2000e-3(a).  A discharge is obviously  an  adverse  employment  action.    The  causal  link requirement is interpreted broadly.  "[A] plaintiff merely has to prove  that  the  protected  activity  and  the  negative  employment action are not completely unrelated." *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993), citing *Simmons v. Camden Bd. of Ed.*, 757 F.2d 1187, 1189 (11th Cir.), cert. denied, 474 U.S. 981(1985).

2

Once the prima facie case is established, the employer must articulate or proffer a legitimate, non-discriminatory reason for the employment action.

The employee then must prove that the articulated reason is a pretext for retaliation. *Meeks v. Computer Associates*, 15 F.3d 1013, 1020-21 (11th Cir. 1994). To prove pretext, a plaintiff must show "...such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employee's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs v. Plantation Patters*, 106 F.3d 1519, 1538 (11th Cir. 1997), citing *Sheridan v. E.I. DuPont DeNemones & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)(en banc).

## II.   The Prima Facie Case

Plaintiff was hired by Norfolk Southern on May 17, 1976, as a secretary in its Mobile, Alabama Sales Office.   She had completed three years of college at that time; subsequently, she has completed several business courses at the University of South Alabama.   In addition to her secretarial duties, plaintiff served effectively as a sales coordinator.   Plaintiff's Exhibit (PX) 103, p. 29.

Plaintiff's job performance in Mobile was summarized in 1992 by the former Mobile District Sales Manager:

3

> Ms. Moore's job performance reviews were
> consistently rated in the commendable and
> outstanding categories. She is very efficient in
> secretarial and clerical skills, accepts
> responsibility and anticipates and reacts to meet
> employer and customer expectations. The foundation
> for her job performance is her positive attitude,
> resulting in high reliability....

Id., p. 33. In her last evaluation, covering the period 1994-95, she was rated as having either "[f]ar exceeded expected results" or "[g]enerally exceeded expected results" in seven out of ten areas. In the remaining three areas, she "met expected results." Id., pp. 49-50.

In December 1991, plaintiff filed her first charge of discrimination against Norfolk Southern with the EEOC. Among other things, she alleged that she had been denied promotions and a full merit increase because of her race.

In a second charge filed in 1992, plaintiff alleged that she had been denied transfer opportunities upon the closing of the Mobile Office because of her race and in retaliation for the original charge of discrimination.

In 1993, plaintiff transferred to the Birmingham Sales Office as a sales coordinator. The functions of that position are essentially the same as those which she performed as a secretary in the Mobile Office. Id., p. 45.

This lawsuit was filed in December 1993, as an individual Title VII action alleging racially discriminatory denials of

4

promotion and retaliation. It was subsequently amended by allegations of classwide discrimination.

Plaintiff was one of the witnesses at the class maintainability hearing which ultimately resulted in the certification of a nationwide class.

Roughly two months before her discharge, plaintiff filed a third EEOC charge, claiming that she had been denied the position of Account Manager (formerly Sales Manager) because of her race and in retaliation for her participation in this case.

At all material times, Norfolk Southern managers have had actual knowledge of plaintiff's EEOC filings and the existence and status of this action as a class action. Put another way, they have all known of her central role in this litigation.

Plaintiff remained a sales coordinator until she was discharged on July 12, 1996.

### III. The Articulated Reason

The discharge letter reads as follows:

> You were scheduled to return from vacation Monday, July 8, 1996; but, you have been absent from work for the entire week of July 8-12, 1996. We have noted that your personal effects have been removed from the office. We have been unable to reach you by telephone and we have not heard from you. It appears that you have elected to quit your employment. Accordingly, we have removed you from the payroll, effective as of the close of business today, June 12, 1996....

PX 103, tab A, p. 55.

5

The letter was sent by L.T. Rasche, the Manager of the Norfolk Southern Atlanta Sales Group, which provides supervision for the Birmingham Sales Office. At the time of her discharge, plaintiff's direct supervisor was Cybil McLaurin, an Office Manager in the Atlanta Sales Group.

IV.   Company Policy Concerning Absences
For Sickness and Job Abandonment

Norfolk Southern has no written policy establishing a report-in procedure for employees who, because of illness, are unable to appear and complete their assigned shift.[1]

The Company's unwritten policy and practice governing reporting in for sickness is simple and well-understood.  When because of sickness an employee is unable to appear for her scheduled shift, she or someone on her behalf is expected to so advise the supervisor by telephone.  Tr. VII, p. 2392, 2393.  If the illness lasts for more than a day, the employee is not required to call in each day of the illness.  In that event, when the employee is able to return to work, she is expected to call the supervisor and so inform of the date of her anticipated return.

---

[1]Apparently, if an employee's illness results in an absence of two weeks or more, a medical excuse is required upon her return to work.

6

Plaintiff was involved in automobile accidents in 1991 and 1995, which resulted in four herniated disks. The accompanying back and neck pain necessitated several absences from 1991 thereafter. Plaintiff was thus well aware of the policy and procedure of reporting absences. So was her supervisor. Tr.VII,p.2232.

Unwritten company policy provides that prior to the final action of discharge, reasonable notice be given to an employee who is suspected of having abandoned her job.[2]

---

[2]The Company has adduced evidence on two employees which confirm this policy.

Cybil Johnson, an employee in Norfolk Southern's Atlanta Real Estate and Contract Services Office, was scheduled to return to work on March 8, 1994. She had been notified by letter dated March 4 that she could not take vacation days or personal time off without prior approval of a supervisor. Defendant's Exhibit ("DX") 72,755. Without prior approval, she did not report to work on March 8. Instead she left a message on her answering machine that she was taking "...a long-term leave of absence." DX 72,777. She never reported to work thereafter. Norfolk Southern sent her a letter on March 11, indicating that unless she returned to work by March 16, her employment would be terminated. On the same day, after hours, Johnson came to the office and removed most of her personal belongings. As of March 18, Johnson had not reported back to work. She was then notified that she was discharged. She has not been heard from since that time.

Conductor Trainee G.C. Hare did not report to work after December 22, 1996. A Norfolk Southern official talked with her on January 3, 1997, and after she related that she had been hospitalized, advised her that she needed to present a note from her doctor before she could return to work. Though numerous attempts were made to contact her - by leaving messages on her answering machine and with the person who answered her phone between January 10 and January 15, she never responded. DX 76. On January 16, 1997, she was notified that, effective immediately, her "...application for employment with Norfolk

There is no evidence that aside from the plaintiff, any employee discharged for having abandoned her job had not in fact abandoned her job at the time of the discharge.

V.  Facts Surrounding The Discharge

A

Plaintiff was scheduled to return to work from vacation on July 8, 1996.

In the early morning of that day, she experienced excruciating pain in her neck and back. Several hours before her scheduled shift, she telephoned her sister, Willhemia "Billy" Foster, at the sister's home in Mobile and requested her to call McLaurin and report her absence.

Shortly after McLaurin arrived at work, plaintiff's husband, John Moore called her and said that plaintiff had run off with another man and was living in Atlanta. According to McLaurin's notes:

> ...He said she had taken the car and had already gotten a job at Lenox Square and worked one day. He said Carol had run up the charge cards and had taken $80,000 of his money. He told me that he did not want her to know he had called, and I told him that I did not want to get in the middle of their problems.

Southern Corporation [was] disapproved." DX 75.

There is no evidence that either Cybil Johnson or G.C. Hare had opposed unfair employment practices at the time that they abandoned their jobs and were discharged on that account.

8

Defendant's Exhibit ("DX") 61.  McLaurin was aware that plaintiff
was having marital problems.

        Within minutes of John Moore's call, plaintiff's sister
phoned   McLaurin   and   informed   her   that   plaintiff   was
"...experiencing excruciating neck pain and she was not feeling
well.  She was going to get in home traction, take her medication,
and she would not be able to come in." Tr.VII,p. 2462.  McLaurin
thanked her for calling and the conversation ended.

        Consistent with McLaurin's testimony, the Court finds
that she never doubted plaintiff's illness on July 8 or on any
other day of that week. Tr.VII, p. 2214.[3]

        Plaintiff's illness precluded her return to work at
anytime during the week of July 8.   There was no basis for any
question of her disabling illness, and Rasche as well as McLaurin
knew it.

        On Friday morning, July 12, McLaurin talked with Billy
Foster again, after having tried unsuccessfully to reach her the

_____

        [3]McLaurin tried unsuccessfully to reach plaintiff by phone
on July 8, 9, and 10 out of concern for plaintiff's physical
health, as she testified.  Tr.VII, p. 2196, 2197, 2210.   The
calls were also made in response to John Moore's continuing calls
to McLaurin.

        By Tuesday, July 9, McLaurin knew the falsity of John
Moore's statement that plaintiff had moved to Atlanta and secured
other employment there.

9

preceding day on direction of her supervisor and officials at national headquarters.  Foster told McLaurin that plaintiff was still sick at home, "...in a lot of pain."  McLaurin related that she had tried unsuccessfully to reach plaintiff.  Foster promised that she would probably come to Birmingham to check on plaintiff, and that she would have plaintiff contact McLaurin.  As it turned out, Foster did not talk to the plaintiff until after business hours on that day.

The July 12 letter discharging plaintiff was sent that afternoon.  McLaurin had no input and was not consulted in the discharge decision.  In fact, she did not learn of the discharge until Sunday, July 14.[4]  Tr.VII, p.2187-89.

B

McLaurin immediately reported her July 8 conversations with plaintiff's sister and estranged husband to L.T. Rasche.

_____

[4]On Saturday, July 13, McLaurin talked with two officials at Norfolk Southern headquarters, Mullinax and Stutsman, concerning plaintiff's status.  She "...reviewed everything with them what (sic.) happened within the last 12-14 hours."  DX 72,753, p.2. There was some discussion of sending plaintiff a registered letter inquiring of her status, why they had not heard from her concerning her status, and informing her of the need for a doctor's confirming statement or report.  McLaurin's notes indicate that the final question to be included in the letter was, **"When will you return to work?"** Id. (emphasis added).

As found below, Mullinax and Stutsman knew at the time of the discussion with McLaurin that Rasche had sent the discharge letter the preceding day.

10

Rasche forthwith communicated with Norfolk Southern national headquarters. He talked with Tom Mullinax, the Assistant Vice-President for Human Resources, and Mark Perrault, Norfolk Southern's in-house counsel specifically assigned to this case. They decided to monitor the developments in plaintiff's marital and illness misfortunes so that they might capitalize on any possibility of adverse action against her.

After his conferences with Mullinax and Perrault on July 8, Rasche E-mailed his immediate supervisor at national headquarters, Tom Lindsey: "[w]e will keep your office apprised of further developments." DX 61.

Rasche then instructed McLaurin to determine whether plaintiff's personal belongings had been removed from her desk.[5] Other than sanitary napkins, the only other "personal item" missing

_____

[5]From her Atlanta Office, McLaurin telephoned C. H. Coleman, a national account representative in the Birmingham Office, and suggested that plaintiff may have removed her personal belongings.

While on the phone with McLaurin, Coleman asked Betty Webb, a co-worker of plaintiff, "Can you please check Carol's desk and see if it has been cleaned out?" Tr.Vol. 7, p. 2443. Webb then walked over to plaintiff's workstation, inspected it, and told Campbell that it did not appear to her that the desk had been cleaned out. Campbell then requested Webb to check the desk drawers, which she did. She again reported to Campbell that the desk did not appear to have been cleaned out. _Id_. 2444.

Campbell then came over to the desk and he and Webb checked it together. Campbell asked Webb about missing "personals" (i.e. sanitary napkins). Webb agreed that none were in the desk drawers, and she agreed the framed photograph of plaintiff's daughter was missing.

11

from plaintiff's desk was a framed photograph of her daughter, which she had returned to her daughter on request several weeks earlier. Her coffee mug, personal clock, and  flower vase remained at the work station in plain view of Campbell and Webb.[6]

McLaurin and Campbell agreed to report that the photograph of plaintiff's daughter "...as well as all her personal items have been cleared out of her desk." DX 61. Both McLaurin and Rasche knew that the report was untrue.

On Thursday, July 11, after receiving a call from Rasche, Lindsay, and Perrault "...to talk about latest events," McLaurin tried unsuccessfully to reach plaintiff's sister, Billy Foster, as discussed earlier.

Within fifteen minutes after talking to Foster on Friday morning, McLaurin commenced abortive efforts to reach Perrault. She reported to Rasche "right away" that plaintiff was still sick. Tr.VII, p. 2214.

Rasche then sent Danny Evans, an Account Manager in the Birmingham Office, and Joe Durham, a Special Agent in the Birmingham Office of Norfolk Southern's Police Department, "...to go over and attempt to make a personal contact on [plaintiff] at her apartment." Tr.VII, p.2264.  Rasche testified:

---

[6]Campbell testified that the mug and clock were missing. The Court discredits his testimony on this issue, finding that the mug, the clock, and the vase remained plainly visible at plaintiff's workstation until sometime in January of 1997.

12

    Q    Did you give Mr. Evans or Mr. Durham instructions to tell the person that answered the door, have Carol Moore call us?

    A    No.  Their instructions were just to see if we could find Carol and offer any help we could.

        ...

    Q    Help her with her health; is that it?

    A    Just to see if we could locate her, talk to her and see if there was any way we could help her.

Tr.VII, p. 2310.  According to Rasche, it was not his intention to deem plaintiff's job abandoned or to discharge her at the time that Durham and Evans were dispatched at roughly 3:00 P.M. on Friday afternoon.  *Id.*, p. 2320-21.  Durham understood his mission not to be investigatory, but rather one of rendering assistance to plaintiff.  Tr.VII, p. 2360.

As it turned out, plaintiff had moved to a different apartment within the preceding month.  With Post Office assistance, Durham located plaintiff's new apartment.  Plaintiff was not home at the time, and Durham did not leave a message with plaintiff's daughter, who answered the door.  Late that afternoon, Durham made his report to the Company.

The decision to discharge plaintiff was a corporate decision, made by Mullinax, Perrault, Stutsman, and Rasche in consultation with each other.  Rasche simply implemented the corporate decision by sending the discharge letter.

13

Sometime after 5:00 P.M. on Friday afternoon, plaintiff talked with her sister and was informed that she should call McLaurin. Since the work day was over, plaintiff resolved to call her on Monday morning. In the meanwhile, plaintiff traveled to St. Louis to get a second opinion from her brother-in-law, a physician, concerning recommended surgery.

From St. Louis, plaintiff called McLaurin on Monday, July 15. She told McLaurin that she was still sick, that surgery had been recommended, and that her brother-in-law had concurred in the recommendation. DX 72,573, p.3-4; Tr.VII, p.2178. After telling plaintiff that they had been trying to reach her the preceding week, McLaurin referred her to Rasche.

Rasche informed plaintiff that she had been sent a letter discharging her, and that she had been removed from Norfolk Southern's payroll.[7] Plaintiff explained that she had been absent because of her illness, that surgery was indicated, and that she had not abandoned her job. Rasche was unmoved.

C

Since her discharge, plaintiff has diligently but unsuccessfully sought interim employment. She has lost the wages she would have earned since the time of her discharge.

---

[7] In point of fact, plaintiff had not been removed from the payroll. It was only after his conversation with plaintiff that Rasche consulted with Mullinax and initiated the paperwork required for removal of plaintiff from the payroll.

14

·

## VI.  Analysis

Plaintiff has clearly established a prima facie case of retaliation premised on her engagement in activities protected by Title VII.

Norfolk Southern has articulated a legitimate, non-retaliatory reason for the adverse employment action.  In Rasche's words:

> ...we had made repeated efforts to contact Carol to no avail, that her personal items had been removed from her desk, that she had not made any effort to contact us during that week, and on the basis that she had vacated her position and we made that decision accordingly.

Tr.VII, p.2285.  In other words, plaintiff was fired because she quit her job, and Norfolk Southern simply wanted "...a formal employment status at that point...so that we could...have some sort of formal status in the future."  _Id._,p. 2273.  See also Mullinax testimony, Tr.VII, p.2385,2386.

Plaintiff has easily shouldered her burden of proving that Norfolk Southern's articulated reason is merely a mask for retaliation.

The "repeated efforts to contact Carol" were made by McLaurin for two reasons.  The primary reason was McLaurin's personal concerns about plaintiff's health and marriage - totally unrelated to plaintiff's job status.  The secondary reason, related

15

solely to the Thursday, July 11 telephonic efforts to reach plaintiff, was that McLaurin was directed to contact the plaintiff by Rasche, Mullinax and Stutsman. According to Rasche, the July 12 efforts of Norfolk Southern's Birmingham agents to physically contact plaintiff were spawned by Norfolk Southern's desire "...to see if there was any way [Norfolk Southern] could help her." according to Rasche. Tr.VII, p.2310. So the attempted contacts were initiated (1) out of personal curiosity on McLaurin's part, (2) to render assistance to the plaintiff, or (3) for some undisclosed use by Rasche, Mullinax, Stutsman and Perrault.

One thing is clear: there was no need for the repeated efforts to contact the plaintiff. Norfolk Southern knew, on the first and last day of its repeated efforts, that the plaintiff was sick and therefore unable to report to work. It confirmed that fact on Friday morning before her discharge that afternoon. There was never any good faith doubt of this central fact.

Norfolk Southern also knew that plaintiff had fully complied with Company policy by giving notice to her supervisor (through her sister) of her illness. The fact that an employee calls in to report her illness is a counterindication of job abandonment, according to Rasche. Tr.VII, p.2317.

Rasche testified that two hours after he dispatched agents to locate the plaintiff so that they could render assistance

16

to her, he and officials at national headquarters discharged the plaintiff because she had abandoned her job.  The only additional information acquired in the two-hour period to support a theory of job abandonment, was the location of plaintiff's apartment and the fact that she was not at home at the time.   Under all of the circumstances, Rasche's testimony is ludicrous.

Why were the head of the Atlanta Sales Group and officials at national headquarters alerted and involved in the duly reported, illness-based absence from work of a single employee (out of over 23,000) in a small Birmingham branch office within the first few hours of the absence?  Aside from the plaintiff's role and status in this litigation, the Company offers no explanation.[8]

Even more problematic is the fact that when plaintiff called Rasche on Monday, July 15 - prior to his completion of the forms required to remove her from the payroll - and told him unequivocally that she was still sick and had not abandoned her job, he and Mullinax persisted in her discharge.  If, as Rasche testified, the Company wanted only to establish "a formal status" for plaintiff's employment, it could easily have done so on July 15

---

[8]Mullinax testified that the significance of Rasche's call to him on the morning of July 8 was that "...we wanted to move with deliberation in investigating because of her status as a class member." Tr.VII, p.2377.  Of course, at that time, there was nothing to investigate.

17

by recognizing her true status: sick.[9]   Its failure to do so
removes the mask of pretext and reveals its true intent:
retaliation.

On a separate and independent consideration, Norfolk
Southern has not offered a scent of explanation or justification
for its differential treatment of plaintiff, on the one hand, and
former employees Johnson and Hare, on the other.   The latter
employees were given reasonable notice and an opportunity to return
to work prior to being sent a discharge letter.   The material
differences between plaintiff and these other former employees are
that Johnson and Hare had in fact abandoned their jobs and had no
further contact with Norfolk Southern after the discharge letters
were sent, and neither Johnson nor Hare had filed an EEOC charge
and/or Title VII lawsuit against Norfolk Southern.

By compelling evidence, plaintiff has proved that Norfolk
Southern's articulated reason is a pretext for its retaliatory
motive underlying her discharge. The articulated reason, i.e., job
abandonment, is implausible and it is contradicted by and
inconsistent with other persuasive evidence.    In sum, it is
unworthy of belief.

_____

[9]Mullinax conceded that at the time of her discharge, the
only information Norfolk Southern possessed concerning
plaintiff's physical condition was that she was sick.   Tr.VII,
p.2396.

18

By separate order, the appropriate relief will be granted.

DONE this _____ 5TH _____ day of June, 1997.

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON

19